# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. '24 MJ1718 SBC
)
Apple iPhone in a red case (Subject Device 1), Purple Apple )
iPhone (Subject Device 2), Black Apple Watch (Subject Device 3) )
)

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 2312, 2313 and 371 | Transportation of stolen vehicles and related charges |

The application is based on these facts:
See Affidavit in Support of Search Warrant

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Evan Kinsel*
Applicant's signature

Special Agent Evan Kinsel, FBI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means)*.

Date: May 2, 2024

Judge's signature

City and state: San Diego, California          Hon. Steve B. Chu, U.S. Magistrate Judge
Printed name and title

# FAFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Evan C. Kinsel, having been duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following cellular telephones and associated cellular devices (collectively, **Subject Devices**):

   a. one Apple iPhone in a red case (hereafter, "**Subject Device 1**");

   b. one purple Apple iPhone (hereafter, **Subject Device 2**); and

   c. one black Apple Watch (hereafter, "**Subject Device 3**")

more particularly described in Attachment A. The Federal Bureau of Investigation (FBI) is holding the **Subject Devices** as evidence at a facility within the Southern District of California.

2. The FBI is investigating Jocsany RUIZ and Zenaida RODRIGUEZ in connection with violations of federal law, including Title 18 U.S.C. Section 2312 (Transportation of stolen vehicles), Title 18 U.S.C. Section 2313 (sale or receipt of stolen vehicles), and Title 18 U.S.C. Section 371 (Conspiracy to transport stolen vehicles in interstate or foreign commerce) ("Target Offenses").

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence of the target offenses exists on the **Subject Devices**, as described in Attachment B.

4. The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during their participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining a search warrant for the **Subject Devices**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

# EXPERIENCE AND TRAINING

5. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 of the United States Code. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since June 2023. I am currently assigned to the FBI San Diego Violent Crimes Task Force, where I investigate a variety of matters, to include homicides, carjackings, kidnappings, bank robberies and Hobbs Act robberies. In such capacity, I have participated in investigations of violent criminals, to include those who are members or associates of robbery crews and criminal street gangs. In the conduct of these investigations, I have consulted with numerous experienced law enforcement officers from federal, state, and local law enforcement agencies, including the Drug Enforcement Administration (DEA), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Immigration and Customs Enforcement - Homeland Security Investigations (ICE-HSI), United States Border Patrol (USBP), US Customs and Border Protection (CBP), the California Highway Patrol (CHP), the San Diego Police Department (SDPD), the National City Police Department (NCPD), and the San Diego Sheriff's Department (SDSD).

6. I completed approximately twenty weeks of training at the FBI Academy in Quantico, Virginia. During the training, I received instruction in a variety of investigative techniques commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of confidential human sources, electronic and physical surveillance techniques, law enforcement tactics, search and seizure laws and techniques, interviewing strategies and skills, and a variety of other subjects.

7. Prior to becoming an FBI Special Agent, I was employed as a Special Agent with the Drug Enforcement Administration from 2019 to 2023, where I led and participated in a wide range of criminal investigations associated with the illegal trafficking of

narcotics, the trafficking and laundering of illicit proceeds, international conspiracies to do the same, gang-drug nexus investigations, and overdose death investigations. In addition, I am a US. Air Force reserve Special Agent with the United States Air Force Office of Special Investigations (AFOSI), a military criminal investigative organization tasked with investigating criminal, fraud, and counterintelligence matters with a nexus to the US Department of Defense. I am a graduate of numerous law enforcement training academies and schools pertaining to the above listed investigative disciplines and law enforcement organizations.

8. I have led and participated in a multitude of investigations, and my interactions with other agents, and other state and local law enforcement officers familiar with violent crimes, illicit cross-border trafficking, and with auto theft crimes, as well as my training, form the basis of the opinions and conclusions set forth below, which I have drawn from the facts set forth herein, and set forth in substance not verbatim, unless otherwise noted.

9. Based on the above investigation, and my training, experience, and consultation with other law officers regarding robberies, auto thefts and other violent crimes:

    a. Multiple individuals coordinating a robbery or a theft will utilize cell phones to arrange meeting times and locations and otherwise discuss the logistics of the robbery or theft.

    b. Individuals involved in auto theft, robberies and other violent crimes who are working in concert with each other often communicate using cellular telephones to plan and carry out robberies or thefts and to dispose of the proceeds of the theft or robbery. Individuals involved in transporting stolen vehicles often use cellular telephones to search and discuss locations where the vehicle is to be sold or given to another co-conspirator involved in processing the stolen vehicle for sale. Individuals involved in transporting stolen vehicles often use cellular telephones to discuss travel plans and cross-border travel. Records of these communications and location related data are often stored within the contents of the phone.

3

c. Individuals involved in auto theft, robberies and other violent crime use cellular telephones to increase their mobility and coordinate illicit activity, through traditional audio conversations, emails, social media, and other electronic applications. Records of these communications are often stored on social media accounts and on email accounts.

d. Individuals involved in auto theft schemes and robberies may utilize web or social media searches related to robbery or theft targets, travel to and from their targets, searches related to methods or techniques for robbery and theft, searches related to possible safety measures at their robbery or theft targets, and searches made after the robberies related to law enforcement investigations into the robberies.

e. Individuals involved in auto thefts, robberies and other violent crimes often have electronic documents and files, which were used to aide and facilitate the commission of the crime. In many instances, these files can contain additional forensic and transactional evidence linking the subject to the crime and/or identification of other co-conspirators. These files may be saved within email or social media accounts.

f. Individuals involved in auto thefts, robberies and other violent crimes often will use cell phones to take photographs of stolen items in order to facilitate the sale of those items. Additionally, individuals involved in auto thefts, robberies and other violent crimes may post these photographs to social media in order to further facilitate the sale.

g. Individuals involved in auto thefts, robberies and other violent crimes often use social media accounts to post photographs of themselves wearing clothing that is later worn during a robbery or crime. These photographs are saved to their accounts and posted before and after the crimes but are often not available to be viewed by the public. These photographs are also often saved to the phone's photo applications and can be carried over from an old phone to a new phone via a cloud application.

h.  Through training and conversations with other special agents and experts, I have learned locations and/or GPS information can be electronically stored within social media accounts and extracted for analysis. This information can indicate times a particular device or social media posting was made near a specific location, such as the scene of a robbery or the residence of a co-conspirator.

i.  Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a criminal's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

12.  It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices, including smart watch devices, today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject

to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may several months.

13. Following the issuance of this warrant, I and fellow law enforcement officers, will conduct an analysis of the contents of the **Subject Devices**. All forensic analysis of the data contained within the telephone and the associated memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

14. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## FACTS SUPPORTING PROBABLE CAUSE

*Background of the Investigation*

15. According to National City Police Department (NCPD) police officers' reports and body worn camera footage, a victim gave a statement to NCPD. The victim described the following: he stated he was carjacked at gunpoint by two male suspects in the evening of January 28, 2024. On that evening, the victim was driving a 2022 Mercedes Benz Sports Utility Vehicle (SUV) bearing California license plates of 9AON586, which he had rented from the Enterprise rental car company. The victim had stopped the vehicle on a street in National City and was inputting an address in his GPS. The victim then saw someone open the passenger door of the vehicle and point a firearm at him. Suspect 1 (S1) then told the victim to drive the vehicle. The victim drove the vehicle down a cul-de-sac and S1 told him to stop the car. A second suspect (S2) then opened the driver door and pulled the victim out of the vehicle. S2 then forced the victim into the back seat of the

vehicle and both suspects drove him around, while holding him at gunpoint demanding that he give them money. The suspects eventually left the victim on the side of the road near Proctor Valley Road. The suspects stole the vehicle, two of the victim's Apple iPhones, his wallet containing personally identifiable information (PII) and credit cards. The victim described one of the suspects (S1) as a heavy-set Hispanic male with a tattoo on the top of one of his hands. The victim described the second suspect (S2) as a Black male with dread lock style hair that came down toward eye level. According to border crossing records, the stolen Mercedes was driven into Mexico at the San Ysidro Port of Entry (POE) on January 29, 2024 at 6:52 p.m. (Pacific Time).

16. Based on my training and experience and research, I am aware that Mercedes Benz is a foreign vehicle manufacturing company headquartered in Stuttgart, Germany. To my knowledge, Mercedes Benz does not operate a manufacturing plant in the state of California in the United States of America. As such, I believe the Mercedes SUV subject to the carjacking on January 28, 2024 had been transported, shipped, or receive in interstate or foreign commerce.

17. On February 29, 2024 at approximately 9:29 p.m., San Diego Police Department (SDPD) officers were notified by SDPD Detectives that MARVIN GEOVANNY RUIZ was in the area of 300 Euclid Avenue in San Diego, California and that RUIZ had an outstanding felony warrant for his arrest. Detectives notified officers that RUIZ was seen entering a yellow Mercedes Benz sedan with California license plate of 9JSK895. Officers observed that vehicle exit the parking lot of the Food for Less in the vicinity of 300 Euclid and observed the driver side windows had tint on them in violation of California Vehicle Code. Officers conducted a traffic stop on the vehicle and the vehicle yielded. Officers found the vehicle was occupied by four individuals, one of whom was positively identified as MARVIN RUIZ, based on a prior booking photograph. RUIZ was removed from the vehicle and placed under arrest. According to law enforcement records, RUIZ has been associated with the East San Diego criminal street gang. Law enforcement records listed RUIZ as a Hispanic male with a height of approximately 6', weight of 200

pounds and a tattoo on his left hand. Investigators reviewed photos taken by SDPD officers of RUIZ following his arrest on February 29, 2024, as well as his booking photo. Investigators observed RUIZ was a heavy set Hispanic male with a tattoo on the top of his hand, matching the description provided by the carjacking victim. RUIZ's booking photo and a photo of him taken by SDPD officers are provided below:

18. On March 12, 2024, a NCPD detective, who is assigned to the FBI Violent Crimes Task Force (VCTF) as a Task Force Officer (TFO) reinterviewed the victim in the carjacking. A separate detective, who is uninvolved with the case, showed the victim a six pack photo array containing RUIZ. The victim positively identified S1 as MARVIN GEOVANNY RUIZ. The victim stated, "I'm a hundred percent positive that's the guy who



pointed a gun at my head". Furthermore, during the interview, the victim stated he remembered the Hispanic male suspect (S1) had a tattoo on the top of his hand. The victim stated the tattoo appeared fresh and dark. The victim remembered the tattoo having an "R" in it.

19. Investigators again reviewed photos of RUIZ taken by Law Enforcement during his most recent arrest on February 29, 2024. Investigators observed that the tattoo on the top of RUIZ's hand appeared to be recently done and the tattoo began with a capital "R" for Ruiz.

20. On March 15, 2024, Hon. Bernard G. Skomal, United States Magistrate Judge signed a complaint charging MARVIN GEOVANNY RUIZ with violating Title 18, United States Code, Section 2119 (Carjacking) and an arrest warrant was issued in the Southern District of California. On April 9, 2024, following the conclusion of RUIZ's sentence in a San Diego County facility on unrelated charges, FBI Agents executed the arrest warrant and transferred RUIZ into federal custody.

21. On March 14, 2024, Investigators conducted a court authorized search of the black iPhone seized by local authorities from RUIZ during his arrest on February 29th. The search was conducted pursuant to a federal search warrant signed by Hon. Bernard G. Skomal. During the search, Investigators observed the following content:

22. There was a messaging conversation between RUIZ's black iPhone and a contact named "Tio Chino" with telephone number 619-418-1792. During the phone conversation, RUIZ sent "Tio Chino" a message on January 29 at approximately 8:24 p.m. stating, "Aye wei". "Tio Chino" responded "Que se va asee" and "I just made it out". At 10:34 p.m., RUIZ sent a screen shot of another messaging conversation in Spanish to "Tio Chino", to which "Tio Chino" responded, "Send me the girls number". RUIZ then sent multiple messages to "Tio Chino" at 1:18 a.m. and 2:45 a.m., during which RUIZ attempted to get the attention of "Tio Chino". In one message sent at 2:45 a.m., RUIZ told "Tio Chino", "It's an emergency" and "Idc [I don't care] if u driving the car […] but answer". RUIZ then indicated he would be in some kind of danger, if "Tio Chino" did not respond. RUIZ said, "There gonna do me […] if u fuck me up". Once "Tio Chino" resumed responding, RUIZ sent him an address in Mexico. At 5:15 p.m., "Tio Chino" sent RUIZ multiple photos of the interior and exterior of the stolen Mercedes. RUIZ then asked for the mileage of the vehicle. "Tio Chino" sent more photos of the exterior of the vehicle and

a photo of the speedometer. The following images were taken of messages between RUIZ's black iPhone and "Tio Chino":

23. Investigators also identified a messaging conversation between RUIZ's black



iPhone and a contact named "Tia Zeno" with telephone number 619-850-2025. On January 30, 2024 at 10:25 p.m., the black iPhone texted "Tia Zeno" a string of messages asking, "Where […] Did U guys leave the car", "Ask him" and "Call me". On January 31 at 1:06 a.m., RUIZ's black iPhone texted "Tia Zeno", "Need to no where car is at […] Why are y'all being y weird […] I need the addres Of the car". On January 31, 2024 at 5:03 a.m., "Tia Zeno" responded by stating "I was hella tired and KO" and sent the address for Macroplaza, a shopping center in Tijuana, Mexico. When RUIZ questioned her about the exact location of the vehicle in the Macroplaza parking lot, "Tia Zeno" stated, "There's a McDonald's […] And it's on the side." At around 12:50 p.m., RUIZ expressed concern that other people could not find the car and that, "They gonna kill me". "Tia Zeno" responded, "I'll see what's up after work and ask jocsany." RUIZ messaged that the car was sold as of the time of his text messages and "It cant be in the parking lot forever." RUIZ then asked her to point to where it is on Google Maps. "Tia Zeno" then sent a link, which appeared to be a Google URL.

24. The FBI searched open-source records and found telephone number 619-418-1792 was attributed to JOCSANY RUIZ of 3788 41st St, Apt 201, San Diego, California. The FBI conducted Department of Motor Vehicles (DMV) and law enforcement records searches for JOCSANY RUIZ. The FBI determined he has previous arrests for bringing Aliens into the United States, Smuggling Aliens, Bringing in and Harboring Aliens, as well as federal probation violations and a charge for Escape. The FBI located the following DMV photo of RUIZ, which showed he had distinctive facial hair, including a beard on his chin and soul patch under his lip:



25. The FBI identified an Instagram account attributed to JOCSANY RUIZ. The account showed multiple photos of JOCSANY RUIZ with the same distinctive facial hair.

26. The FBI searched open-source records and found telephone number 619-850-2025 was attributed to ZENAIDA RODRIGUEZ of 3303 Central Ave, San Diego, California. The FBI conducted Department of Motor Vehicles (DMV) and law enforcement records searches for ZENAIDA RODRIGUEZ (alternative name ZENAIDA

SALINAS; DOB 01/27/1992). The FBI located the following DMV photo of RODRIGUEZ:



27. The FBI conducted open-source checks and identified a Facebook account for RODRIGUEZ under the name "Zee Rodriguez". JOCSANY RUIZ's Facebook account left a comment on one of her photographs posted to the account, in which he called her "love of my life".

28. The FBI obtained the following image of the stolen Mercedes exiting the United Sates, which showed the driver to be a male with distinctive facial hair, including a beard on his chin and soul patch:



29. The FBI checked border crossing records, which indicated JOCSANY RUIZ departed the United States and was in Mexico during the same timeframe when the

Mercedes was transported into Mexico. Crossing records logged JOCSANY RUIZ entering the United States on January 29, 2024 at 2:48 a.m. (Pacific Time). Then, on January 30, 2024, records showed he re-entered the United States via the San Ysidro Port of Entry (POE) at approximately 8:22 p.m. (Pacific Time), more specifically he re-entered with ZENAIDA RODRIGUEZ in a vehicle registered to her. Crossing records revealed ZENAIDA RODRIGUEZ's vehicle had entered Mexico in her vehicle at 6:48 p.m. (Pacific Time), several hours prior to when she and JOCSANY RUIZ re-entered California.

30. Based on the information from the black iPhone belonging to MARVIN RUIZ, open-source information confirming JOCSANY RUIZ and ZENAIDA RODRIGUEZ's connections to the numbers of "Tio Chino" and "Tia Zeno", the image of the Mercedes being taken into Mexico and crossing records, I believe JOCSANY RUIZ (a.k.a. "Tio Chino") knowingly drove the stolen Mercedes into Mexico, JOCSANY RUIZ and ZENAIDA RODRIGUEZ (a.k.a. "Tia Zeno") conspired to possess and conceal the stolen vehicle in Mexico. Furthermore, I believe that, upon returning to the United States, ZENAIDA RODRGIUEZ passed information regarding the location of the stolen Mercedes to MARVIN RUIZ in order to facilitate the sale of the vehicle.

31. On April 23, 2024, based on the above probable cause, the FBI sought and received federal arrest warrants for ZENAIDA RODRGIUEZ and JOCSANY RUIZ.

*Arrest of Subjects and Identification of **Subject Devices***

32. On April 23, 2024, US Customs and Border Protection (CBP) notified the FBI that ZENAIDA RODRGIUEZ and JOCSANY RUIZ had attempted reentry into the United States through the San Ysidro Port of Entry and were apprehended by CBP Officers. At the time of their arrest, CBP Officers and FBI Special Agents discovered the following items in RUIZ and RODRIGUEZ's possession and held them as evidence:

    a. One (1) Apple iPhone in a red case belonging to JOCSANY RUIZ

    b. One (1) purple Apple iPhone belonging to ZENAIDA RODRGIUEZ

    c. One (1) black Apple Watch belonging to ZENAIDA RODRGIUEZ

13

1   33.     The above listed **Subject Devices** are secured at the FBI San Diego field office. Considering the accessibility of property to the public and Agents' understanding of the subjects' use of cellular telephones, Agents believed there to be a high likelihood that **Subject Devices** contained evidence of Target Offenses and evidence present on **Subject Devices** would be destroyed, if it were not seized at that time. Agents obtained custody of **Subject Devices** in order to preserve it's evidentiary integrity and to seek a warrant from the Court. On the date the devices were seized, Agents transported **Subject Devices** to the San Diego Field Office of the FBI located at 10385 Vista Sorrento Parkway, San Diego, California for entry as evidence.

34.     Based on these facts, I believe RUIZ and RODRIGUEZ committed the target offenses in violation of Title 18 U.S.C. Section 2312 (Transportation of stolen vehicles), Title 18 U.S.C. Section 2313 (Sale or receipt of stolen vehicles), and Title 18 U.S.C. Section 371 (Conspiracy to transport stolen vehicles in interstate or foreign commerce). The FBI believes there is probable cause that evidence relative to the Target Offenses is present on the **Subject Devices** and therefore seeks to seize and search **Subject Devices** in order to review this evidence and further the investigation.

## GENUINE RISK OF DESTRUCTION OF DATA

25.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

## CONCLUSION

26.     Based on all of the facts and circumstances described above, there is probable cause to believe that the **Subject Devices** contain evidence of the target offenses.

27.     THEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the

14

items described in Attachment A and the seizure of items listed in Attachments B using the electronic search procedures described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Evan Kinsel*
Evan C. Kinsel
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 2nd day of May, 2024.

The Honorable Steve B. Chu
United States Magistrate Judge

# ATTACHMENT A

PROPERTY TO BE SEARCHED

The property/items to be searched is described as follows:

1. One (1) Apple iPhone in a red case ("**Subject Device 1**")

2. One (1) Purple Apple iPhone ("**Subject Device 2**")

3. One (1) Black Apple Watch ("**Subject Device 3**")

**Subject Devices 1, 2 and 3** are currently being held as evidence by the FBI within the Southern District of California.

# ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search **Subject Devices 1, 2 and 3** described in **Attachment A** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular phone. The seizure and search of **Subject Devices 1, 2 and 3** will be conducted in accordance with the affidavit in support of the search warrant.

The evidence to be seized from **Subject Devices 1, 2 and 3** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data for the period of January 28, 2024 through, and including, April 23, 2024 (the date the phone was seized):

a. tending to indicate efforts to steal vehicles, transport stolen vehicles, and transmit proceeds attained from the vehicle thefts and materials taken from the stolen vehicles (i.e. victims' personal belongings left inside stolen vehicles);

b. tending to identify co-conspirators, criminal associates, or others involved in the alleged crimes;

c. tending to identify travel to or presence at San Ysidro, California, to include the San Ysidro Port of Entry (POE), at locations where vehicles were stolen and to locations in Mexico believed to be connected to the alleged crimes (i.e. stash locations for stolen vehicles or locations of fences for stolen vehicles);

d. tending to identify victims of vehicle theft, searches related to methods or techniques for stealing vehicles and the transportation of stolen vehicles, and searches related to possible measures to evade detection from Law Enforcement (i.e. the use of fake license plates or stolen license plates to mask the identity of the stolen vehicle while in transit);

e. tending to identify the user of, persons with control over assess to, the

        telephone; and/or;

    f. tending to place in context, identify the creator or recipients of, or establish the time of creation or receipt of communications, records, or data, involved in the activities described above;

which are evidence of violation of Title 18 U.S.C. Section 2312 (Transportation of stolen vehicles), Title 18 U.S.C. Section 2313 (sale or receipt of stolen vehicles), and Title 18 U.S.C. Section 371 (Conspiracy to transport stolen vehicles in interstate or foreign commerce). The seizure and search of the cellular phone(s) shall follow the procedures outlined in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the cellular phone(s) may be searched for evidence of the above.